# Nos. 23-11322-A, 23-12282-A

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

_____

## UNITED STATES OF AMERICA,

*Plaintiff/appellee,*

v.

## LAWRENCE ALEXANDER,

*Defendant/appellant.*

_____

## On Appeal from the United States District Court
## for the Southern District of Florida

_____

## APPELLANT LAWRENCE ALEXANDER'S INITIAL BRIEF

_____

**RICHARD C. KLUGH, ESQ.**
**Law Office of Richard C. Klugh**
**Counsel for Defendant-Appellant**
**40 N.W. 3rd Street, PH 1**
**Miami, Florida 33128**
**Tel. (305) 536-1191**

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

**United States v. Lawrence Alexander, Case Nos. 23-11322-A, 23-12282-A**

Appellants file this Certificate of Interested Persons and Corporate Disclosure Statement, listing the parties and entities interested in this appeal, as required by 11th Cir. R. 26.1.

Clouser, D. Keith

Davidovic, Ronald

de Boer, Jamie

Doyle, Lauren

Eiglarsh, Mark R.

Gonzalez, Juan Antonio

Grove, Daren

Horenstein, Bradley

Hough, Meredith

Humana Inc. (HUM)

Kleiner, Ronald

Klugh, Richard C.

Laing, Andrew

Louis, Hon. Lauren F.

C-1 of 2

**United States v. Lawrence Alexander, Case Nos. 23-11322-A, 23-12282-A**
**Certificate of Interested Persons (cont'd)**

Pasano, Michael

Queenan, Patrick J.

Quiñon, Jose M.

Quintero, Jr., Frank

Rubio Lisa Tobin

Moore, Hon. K. Michael

Sanders, Jeremy

Scalon, John

Seitles, Marc David

United Healthcare Inc. (UNH)

Wagner, Catherine

Wax, Barry M.

Waxman, Jeremy

Wylie, John W.

## STATEMENT REGARDING ORAL ARGUMENT

Appellant requests oral argument.  His prosecution was premised on the theory he aided and abetted submission to Medicare of a notice form that incorrectly stated ownership information regarding an orthopedic supply company.

The evidence showed the form did not inquire about, invite inclusion of, or relate to the company's ownership; instead, any ownership information constituted surplusage on the form, which served merely as a notification to Medicare of the company's hours of operation.  Review of ownership information was not part of the Medicare contractor's scope of action for the form.

The only action the Medicare contractor was directed to take regarding the form was to evaluate whether the changed hours followed Medicare guidelines and, if necessary, notify the provider to revert to its former hours.  Billing authorization and the scope of services authorized for billing were not at issue.

No other person has been prosecuted under 18 U.S.C. § 1035 (materially false statement as to health care billing or services) on the theory employed by the government.  Nor was there any evidence appellant knew of the making of the false statement or even of the change of hours. The conviction and sentence are infirm for these and other reasons, including first impression statutory interpretation questions. This appeal merits oral argument.

i

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS. . . . . . . . . . . . . . . . . . . . . . . . . C-1

STATEMENT REGARDING ORAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

STATEMENT OF ADOPTION OF BRIEF OF CO-APPELLANT . . . . . . . . . viii

STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ix

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    Proceedings, Disposition in the District Court and Statement of Facts . . . . 2

        1.    Factual background of Alexander's investment in a durable medical equipment company. . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        2.    Government indicts Alexander under theory of false statement made in request to Medicare to enroll Silent Hill: enrollment-application theory . . . . . . . . . . . . . . . . . . . . . . . . . 4

        3.    Pretrial proceedings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        4.    Trial evidence refutes government enrollment-decision theory . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

5.   The government moves away from the required-information theory of materiality and pursues an obligation-to-correct theory of materiality . . . . . . . . . . . . . . . 8

6.   Materiality Instruction Submitted to the Jury . . . . . . . . . . . . 11

7.   Trial and verdict . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

8.   Sentencing, Restitution, and Forfeiture. . . . . . . . . . . . . . . . . 21

STANDARDS OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

SUMMARY OF THE ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

I.    The District Court Erred in Denying Alexander's Motion to Dismiss Count 19 for Failure to State an Offense under 18 U.S.C. § 1035 . . . . . . . 26

II.   The Evidence Was Insufficient to Convict Alexander of the Material False Statement Allegation of Count 19 . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

   A.   Ownership information that was unnecessarily inserted into a Silent Hill change-of-hours form was not material given the context of the applicable administrative review and did not fall within the scope of 18 U.S.C. § 1035 . . . . . . . . . . . . . . . . . . 31

   B.   Evidence of vicarious liability was lacking; Alexander did not have actual or constructive knowledge of the making of the false statement, and the government's aiding-and-abetting liability theory was speculative and unproven . . . . . . . . . . 42

iii

    C.    Failure to establish venue requires vacating the conviction

          and remanding for a new trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

III.   The District Court's Erroneous Jury Instruction on Materiality Resulted

     in Alexander's Conviction on an Inapplicable Theory and Deprived

     Alexander of a Fair Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

IV.   The District Court Erred in Imposing Forfeiture the Government Had

     Not Sought or Provided Notice of as of Sentencing and Which Rested

     on Speculation as to Uncharged Crimes Untethered to the Offense of

     Conviction, Violating Fifth and Sixth Rights, Forfeiture Statutes, and

     Fed. R. Crim. P. 32.2, Including as to Acquitted Conduct . . . . . . . . . . . . . 52

    A.    Erroneous restitution award where causation was lacking . . . . . . . . 52

    B.    Erroneous forfeiture order . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT . . . . . . . . 58

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

iv

# TABLE OF AUTHORITIES

## Cases

*Chiarella v. United States*, 445 U.S. 222 (1980) . . . . . . . . . . . . . . . . . . . . . . . . 36

*Ciminelli v. United States*, 143 S. Ct. 1121 (2023) . . . . . . . . . . . . . . . . . . . . . . 35

*Dunn v. United States*, 442 U.S. 100 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Hendrix v. United States*, 327 F.2d 971 (5th Cir. 1964) . . . . . . . . . . . . . . . . . . 44

*Kungys v. United States*, 485 U.S. 759 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Maslenjak v. United States*, 582 U.S. 335 (2017) . . . . . . . . . . . . . . . . . . . . . 35, 37

*McIntosh v. United States*, 601 U.S. 330 (2024) . . . . . . . . . . . . . . . . . . . . . . . . 56

*Meer v. United States*, 235 F.2d 65 (10th Cir. 1956). . . . . . . . . . . . . . . . . . . . . 41

*Rewis v. United States*, 401 U.S. 808 (1971). . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Rosemond v. United States*, 572 U.S. 65 (2014) . . . . . . . . . . . . . . . . . . . . . . . . 45

*Steiner v. United States*, 940 F.3d 1282 (11th Cir. 2019) . . . . . . . . . . . . . . . . . 45

*United States v. Bajakajian*, 524 U.S. 321 (1998). . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Bazantes*, 978 F.3d 1227 (11th Cir. 2020). . . . . . . . . . . . . . . . 40

*United States v. Beer*, 518 F.2d 168 (5th Cir. 1975) . . . . . . . . . . . . . . . . . . . 31, 32

*United States v. Camargo-Vergara*, 57 F.3d 993 (11th Cir. 1995). . . . . . . . . . . 44

*United States v. Carrasco*, 381 F.3d 1237 (11th Cir. 2004) . . . . . . . . . . . . . . . . 23

*United States v. Corcuera-Valor*, 910 F.2d 198 (5th Cir. 1990) . . . . . . . . . . . . . 41

*United States v. Davis*, 754 F.3d 1205 (11th Cir.), *opinion reinstated*

    785 F.3d 498 (11th Cir. 2015) (en banc) . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*United States v. Demaria*, 644 F. App'x 933 (11th Cir. 2016) . . . . . . . . . . . . . . 41

v

*United States v. Diaz*, 690 F.2d 1352 (11th Cir. 1982) . . . . . . . . . . . . . . . . . 40, 41

*United States v. Elbeblawy*, 899 F.3d 925 (11th Cir. 2018) . . . . . . . . . . . . . . . 23

*United States v. Elkins*, 885 F.2d 775 (11th Cir. 1989) . . . . . . . . . . . . . . . . 36, 38

*United States v. Esquenazi*, 752 F.3d 912 (11th Cir. 2014) . . . . . . . . . . . . . . . 48

*United States v. Farias*, 836 F.3d 1315 (11th Cir. 2016) . . . . . . . . . . . . . . . . . 57

*United States v. Finn*, 375 F.3d 1033 (10th Cir. 2004) . . . . . . . . . . . . . . . . . . . 39

*United States v. Gaudin*, 515 U.S. 506 (1995) . . . . . . . . . . . . . . . . . . . . . . . . 31, 39

*United States v. Grigsby*, 111 F.3d 806 (11th Cir. 1997) . . . . . . . . . . . . . . . . . 51

*United States v. Grimon*, 923 F.3d 1302 (11th Cir. 2019) . . . . . . . . . . . . . . . . 23

*United States v. Hayes*, 574 F.3d 460 (8th Cir. 2009) . . . . . . . . . . . . . . . . . . . 46

*United States v. Henderson*, 893 F.3d 1338 (11th Cir. 2018) . . . . . . . . . . . . . . 28

*United States v. Honeycutt*, 581 U.S. 443 (2017) . . . . . . . . . . . . . . . . . . . . . . . 54

*United States v. Lee*, 77 F.4th 565 (7th Cir. 2023) . . . . . . . . . . . . . . . . . . . . . . 57

*United States v. Liss*, 265 F.3d 1220 (11th Cir.2001) . . . . . . . . . . . . . . . . . . . . 52

*United States v. Martinez*, 555 F.2d 1269 (5th Cir.1977) . . . . . . . . . . . . . . . . . 47

*United States v. Melgen*, 967 F.3d 1250 (11th Cir. 2020) . . . . . . . . . . . . . . . . . 28

*United States v. Morin*, 33 F.3d 1351 (11th Cir. 1994) . . . . . . . . . . . . . . . . . . . 23

*United States v. Newton*, 44 F.3d 913 (11th Cir. 1994) . . . . . . . . . . . . . . . . . . . 47

*United States v. Perez*, 922 F.2d 782 (11th Cir. 1991) . . . . . . . . . . . . . . . . . . . 44

*United States v. Robison*, 505 F.3d 1208 (11th Cir. 2007) . . . . . . . . . . . . . . . . 47

*United States v. Smith*, 22 F.4th 1236 (11th Cir. 2023) . . . . . . . . . . . . . . . . . . 50

*United States v. Steele*, 178 F.3d 1230 (11th Cir. 1999) . . . . . . . . . . . . . . . . . 23

*United States v. Stone*, 9 F.3d 934 (11th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . 48

vi

*United States v. White*, 27 F.3d 1531 (11th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . 32

*United States v. Whiteside*, 285 F.3d 1345 (11th Cir. 2002) . . . . . . . . . . . . . . 35, 39

*United States v. Willner*, 795 F.3d 1297 (11th Cir. 2015) . . . . . . . . . . . . . . . 36, 38

*United States v. Young*, 108 F.4th 1307 (11th Cir. 2024) . . . . . . . . . . . . . . . . . . 52

## Other Authorities

U.S. Const., amend. V (Due Process Clause) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

18 U.S.C. § 2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

18 U.S.C. § 371 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 982(a)(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

18 U.S.C. § 1001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

18 U.S.C. § 1035 . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 5, 10, 24, 25, 26, 27, 28, 29, 31

21 U.S.C. § 853 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Fed. R. Crim. P. 32.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 25, 52, 55, 56

Fed. R. Crim. P. 32.2(b)(2)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56, 57

Fed. R. Crim. P. 32.2(b)(4)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56, 57

42 C.F.R. § 424.57(c)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 34

42 C.F.R. § 424.516 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 14

## STATEMENT OF ADOPTION OF BRIEF OF
## CO-APPELLANT UNDER FED. R. APP. P. 28(i)

Appellant Lawrence Alexander, pursuant to Fed. R. App. P. 28(i) and 11th Cir. R. 28-1(f), hereby adopts the statement of the issues, summary of argument, and argument and citations of authority of the initial brief of co-appellant Dean Zusmer, as to Issue II(a) & (b) and Issue IV, to the extent appellant Alexander has standing and is similarly situated in regard to those claims of error, including arguments concerning the legal insufficiency of the indicted charges of false statement on a Medicare enrollment application and erroneous use of a deliberate ignorance jury instruction.

## STATEMENT OF JURISDICTION

The district court's jurisdiction arose under 18 U.S.C. § 3231 because the defendant was charged with offenses against laws of the United States.  This Court has jurisdiction over the appeal under 28 U.S.C. § 1291, which gives courts of appeals jurisdiction over all final decisions of district courts of the United States, and 18 U.S.C. § 3742, which affords jurisdiction to review criminal sentencing judgments.  Alexander timely filed notices of appeal (DE:459, 490) from the judgment and commitment order and amended judgment and commitment order (DE:458, 488) that dispose of all issues in his case.

## ISSUES

I.    The district court erred in denying Alexander's motion to dismiss Count 19 of the indictment, where the district court relied on an enrollment-application theory that evidence at trial did not support and where the false statements prohibition of 18 U.S.C. § 1035 does not extend beyond Medicare billing and billable-services jurisdiction and does not reach non-billing-related communications.

II.    The evidence was insufficient to prove Alexander made a materially false statement in a Medicare billing matter, where the inaccurate information at issue was not part of the matters requested or reviewed by Medicare; did not change the billing or scope of services for which authorization already existed; and was inconsistent with Alexander's interests, was not known to Alexander, and was of speculative derivation.  The government also failed to establish venue given the unknown location of the making and submission of the statement.

III.    The district court erroneously instructed the jury on an inapplicable theory of materiality.

IV.    The district court erred by imposing procedurally improper and substantively unfounded restitution and forfeiture orders that disregarded Alexander's acquittal of all fraud-related allegations.

1

## STATEMENT OF THE CASE

### Proceedings, Disposition in the District Court, and Statement of Facts

Lawrence Alexander appeals from his conviction of one count of submitting a "materially false" statement "in connection with the delivery and payment for health care items and services," in violation of 18 U.S.C. § 1035 (Count 19 of the indictment). DE:1, 488. Alexander's indictment, DE:1, filed August 31, 2021, alleged various conspiracies and substantive offenses by co-defendants Jeremy Waxman, Dean Zusmer, Ronald Davidovic, and Umut Vardar. Alexander, however, was charged in only two counts. Count 6—of which Alexander was acquitted—alleged Alexander conspired with the co-defendants, in violation of 18 U.S.C. § 371, to pay kickbacks and to defraud the United States by interfering with Medicare administration. Count 19 alleged, under 18 U.S.C. § 1035, the submission of a materially false Medicare billing and services statement in 2019. Alexander was not charged with being part of the overarching health care fraud conspiracy (Count 1) or committing any substantive health care fraud. In light of Alexander's acquittal of all conspiracy and fraud allegations, this brief principally addresses the § 1035 charge and the evidence, argument, rulings, and instructions pertinent to that charge.

1.    **Factual background of Alexander's investment in a durable medical equipment company.**

In 2009, Alexander, an orthopedic surgeon, met and became friends with co-defendant Jeremy Waxman, a successful medical supply businessman who operated a durable medical equipment ("DME") business, Equilibrium Medical Supply. DE:398:160; DE:399:266.

In 2016, Waxman's DME biller, Mindy Breitman, advised Waxman to begin distributing DME products through other entities formally owned by other persons to reduce Medicare scrutiny of the volume of business Waxman was doing with his own DME company. DE:399:276. Waxman approached several individuals, including Alexander, about opening DME companies. Breitman would later testify she never met or spoke with Alexander, dealing instead with Waxman, and she believed Waxman owned the DME company Alexander opened, Silent Hill Bracing and Orthopedic Supplies, LLC. DE:396:247.

Waxman convinced Alexander to make the substantial financial investment necessary, i.e., the startup capital, to open the new DME company; he told Alexander he would handle the business side, so that Alexander could continue to focus on his surgical practice, leaving Alexander a passive investment role. DE:399:292.

3

Alexander placed the new company in the name of his mother, Susan Alexander, just as Alexander had included his mother in other business ventures. DE:402:52–54. "Silent Hill," the name of the new DME supplier, was the name of the town where Alexander's mother was born, and her ownership interest was documented in Florida public records and business filings. DE:396:149. At the same time, Alexander continued with his successful orthopedic surgical practice, with no legal or regulatory issues. DE:399:268–69.

**2.    Government indicts Alexander under theory of false statement made in request to Medicare to enroll Silent Hill: enrollment-application theory.**

The government originally explained its prosecution theory of Alexander's false statement charge in its response to Alexander's motion to dismiss Count 19. The government argued Alexander, in 2019, aided and abetted the submission of an application for Medicare *enrollment*, a CMS Form 855S for Silent Hill, from which he willfully omitted ownership and management disclosures that were *required* for Medicare to make a decision on whether to *enroll* a DME supplier as a Medicare provider and to grant authorization to bill Medicare for orthotic braces prescribed for patients. DE:123. The government argued, and ultimately convinced the district court, that the indictment properly charged that Alexander submitted "'an application, CMS Form 855S,' which, among other disclosures, *required* disclosure of owners and

4

managers of the provider." DE:123:6 (quoting DE:1); *see* DE:199:7 (magistrate judge finds indictment sufficient because government alleges the "form requires applicants to disclose individuals or organizations with ownership or partnership interests"); DE:281 (order adopting magistrate judge report).

### 3.    Pretrial proceedings.

Alexander's pretrial motion to dismiss Count 19 was based on his contention that the CMS Form 855S at issue did not fall within the billing-for-services scope of 18 U.S.C. § 1035. DE:101; DE:223. The district court denied the motion, concluding that an enrollment application that initiates the enrollment of the provider into the Medicare program, and thus permits the provider to bill Medicare, qualifies under § 1035. DE:199; DE:253. It was not until post-trial proceedings that the government admitted that although the indictment characterized the false statement as material to requesting to be enrolled so as to permit billing, the document at issue instead was a notification of change of hours for which Medicare would either accept the changed hours or direct the provider to revert to its prior hours, with no other Medicare decision involved. DE:482:2.

Alexander also moved for a bill of particulars, seeking Count 19 particulars as to how submission of the CMS Form 855S at issue related to the enrollment application process, because the indictment did "not allege that the purported non-disclosure [of ownership information] had any potential effect on Medicare's

decision to enroll Silent Hill as a Medicare provider" and did "not reconcile the specific requirements of the form with the alleged deficiencies in its submission." DE:103:2, 3. Alexander sought particulars as to when the document was signed, who was present for its signing, whether Alexander was alleged to have seen the original or a copy of either the signed form or an uncompleted version of that form, what, if any, billing was associated with the filing of the form, and "the enrollment materiality of the allegedly false document." DE:103:11. The government opposed providing the requested particulars, DE:122, and the district court denied the motion. DE:215.

Alexander also filed a motion to admit polygraph evidence. DE:100. Alexander passed two polygraph examinations, the second of which was performed by James Orr, a former FBI agent who trains the government on how to perform polygraphs. DE:125:2-3. Orr's polygraph was independently examined by world-renowned polygraph expert, Dr. Charles Honts, who confirmed the polygraph results. DE:125:5–8. The district court excluded the polygraph evidence. DE:400:286-87.

**4.    Trial evidence refutes government enrollment-decision theory.**

The government continued to maintain its *required-contents-of-enrollment-application* theory even after trial commenced. *See* DE:395:219 (government opening statement asserts Alexander "filed false enrollment forms"). But the governing regulations and documentary evidence offered at trial showed the Silent Hill form at issue was not an enrollment request or application for billing privileges,

but was a change-of-hours notice to Medicare. As a change-of-hours form, the document had *no requirement of disclosure of ownership or management information*, and such disclosures were not even "optional" line items on the form. *See* Govt-Exh:108.

Because the ownership and management sections of the form—Sections 8 and 9—were neither required nor optional on a change-of-hours form, they were not part of the change-of-hours review done by Medicare (through its contractors). *See* DE:435-1 (Govt-Exh:108) at page 7 (requiring filer to report intervening adverse legal actions, but no other intervening events or corrections other than information that had changed within the prior 30 days; expressly omitting Sections 8 and 9—ownership and management sections—from "required" and "optional" categories when change of hours was reported); DE:482:2 (Medicare review limited to reported changed information, not surplusage). The government, post-trial, conceded that Medicare distinguishes, and treats very differently, an enrollment application from a "change request." DE:482:2. Notably, while applications for enrollment may be denied, a change request that is not approved does not result in denial of billing privileges; instead, "[i]f the change(s) are rejected, the Medicare provider must [simply] revert to the operation as it was prior to the change(s)." *Id*.

7

5.   **The government moves away from the required-information theory of materiality and pursues an obligation-to-correct theory of materiality.**

Prior to resting its case, the government began to shift away from claiming every submission of a CMS Form 855S *requires* ownership information as was charged in Count 19.  Thus, as of the time of Alexander's motion for judgment of acquittal at the close of the government's case, the government no longer argued that ownership information was automatically required as to the Silent Hill change-of-hours notice, but instead that omission of complete information was nevertheless material because Medicare might react in an adverse manner if it discovered a provider failed to update previously-submitted incorrect information and, further, that an August 25, 2016 letter sent to Silent Hill (Govt-Exh:107K) by a Medicare contractor had advised that if any owners were omitted from the enrollment, the provider should immediately update the records.[1]  And Government Exhibit 1028A, correspondence from a Medicare contractor in 2016, notified Silent Hill that if "any information [submitted] is not true, correct or complete, [Silent Hill's designated official or delegated employee] should notify the CMS EUS help desk of this fact immediately," by telephone.  *See* DE:400:273 (government counsel argues: "[W]e put

---

[1]  The specific language used in the letter was:  "[I]f there are any 5% or greater owners that are not listed, please notify the National Supplier Clearinghouse (NSC) immediately to have your enrollment record updated."  Govt-Exh:107K:1.

in documents to show that there is an ongoing obligation, whenever you talk to Medicare, *to update who the owners* are.") (emphasis added); *see also id*. at 276 ("Mr. Quindoza explained the different types of 855. He said for all of them, if they're false, Medicare stops paying on them. He said that this is important to us. It's why there is a certification. Why the certification is multiple pages. It's that they care about that document. And they make you disclose the ownership, *and promise if it changes, you'll update them*.") (emphasis added).

The CMS Form 855S, however, requests only that recently-changed information be reported with no reference to use of the form generally to correct prior misinformation. *See* 42 C.F.R. § 424.57(c)(2) ("The supplier must report to CMS any changes in information supplied on the application within 30 days of the change."); Govt-Exh:108:4 (form states: "Any field marked as optional is not required to be completed **nor does it need to be updated** or reported as a 'change of information' as required in 42 C.F.R. section 424.516.") (emphasis added). Most importantly, Alexander was not charged with any crime of failure to "update" enrollment information, but instead with making a false entry for a required component of an enrollment application form, a theory expressly refuted by the terms of the form itself and implicitly refuted by the government's changed theory of Medicare requirements to an update requirement not mentioned in the indictment. The indictment included

no mention of a regulatory obligation to update years-old inaccuracies on a CMS Form 855S. *See* DE:1:31.

The government, in its rebuttal closing argument, did not claim the form at issue in Count 19 expressly *required* ownership or management information when used to report an immaterial change in the posted hours of operation, but instead argued Alexander "ha[d] an *ongoing duty to update* that." DE:403:81 (emphasis added).

Alexander, in his post-trial motion for judgment of acquittal, argued that the government's revised theories at trial of the form's requirements and the materiality of the inclusion of unrequested information on the form run contrary to the "materially false statement" element of § 1035 as charged in the indictment. The district court instead adopted the government's rebuttal closing argument theory that Alexander had an ongoing duty to admit that a Silent Hill enrollment form filed in 2016 was erroneous and Silent Hill therefore could not submit a change-of-hours notice without also admitting the previous inaccurate statement. DE:467:24 ("So, under your theory, if I submit one form outside the statute of limitations that's false, then I'm forever free in the future to go forward and continue to submit claims for reimbursement and there's no accountability for that?"). The district court, in its written order denying the post-trial acquittal motion, relied erroneously on the theory

10

that the form *required* ownership information of every filer and that the failure to complete that section of the form could have ended the provider's Medicare enrollment. *See* DE:446:15 ("And, had the 855S Form not included the false statement, Medicare could have revoked Silent Hill's status and stopped making payments ... .").

Whether Medicare has a separate form for correcting previously submitted forms was not addressed in the evidence presented at trial, other than Government Exhibit 1028A's reference to a help desk call line. Moreover, CMS Form 855S does not require that all changes be included on one form. Nor did the government charge Alexander with violating a regulatory requirement to correct prior misstatements. Nor did the government identify any statute—in even non-Medicare contexts—as to which the district court's ore tenus grounds for denial of the post-trial motion for acquittal, DE:467:24, might apply.

**6.    Materiality Instruction Submitted to the Jury**

The significant level of confusion at trial as to what requirement Alexander was actually accused of violating was manifested in the jury instruction on materiality, to which Alexander objected. The government-submitted materiality instruction required, as to Count 19, a finding that Alexander had made a false statement material to a decision by Medicare on whether to *enroll* Silent Hill as a Medicare provider.

DE:356:27. But no such decision was being made by Medicare. Contrary to the jury instruction, the form at issue, despite its name, had multiple purposes—not all of them relating to an enrollment decision. When used by a provider to report immaterial changes (such as the hours of the day that the provider maintains the business open to meet the 30 hours per week requirement), the form is not an *enrollment* application at all, but rather a post hoc request for approval of the change in hours. *See* Govt-Exh:108:7. If a change in hours is rejected, the enrollment is not canceled. Instead, the provider would simply need to revert to its prior hours. DE:482:2. Thus, the materiality instruction caused the jury to resolve the case on the illusory concept of an *enrollment* decision, adding a further level of legal confusion to the already existing testimonial and prosecution-theory confusion about the form.

Silent Hill had, in *2016*, submitted an *enrollment* application, also using a CMS Form 855S. That form *did* require ownership and management information. But the government did not charge the making of a false statement on that form. And the *2019* form, used to report changes in the provider's specific opening and closing business hours, involved no *enrollment* evaluation at all, leaving no factual basis to find materiality under the jury instruction. Given that the ownership information on the 2019 form was surplusage, the information was by its very nature immaterial to the hours-review decision by Medicare.

7.    **Trial and verdict.**

Alexander and Zusmer were the only defendants to proceed to trial.  The evidence regarding Count 19 was limited, with no witness claiming to have any recollection regarding the preparation, signing, submission, receipt, or processing of the form or any matter included on the form.

Government cooperating witness Kelly Wolfe was asked her to explain various Medicare requirements for DME providers.  Wolfe had 30 years of experience in the DME industry and owned Regency, a third-party billing and consulting company.  DE:397:266–67.  The government asked Wolfe to explain the requirements of the CMS Form 855S when only a "change of information" is being reported, as in this case, rather than when it is used as an application for new enrollment of a Medicare provider.  Wolfe explained that when the form was used solely to change information, only those sections that were the subject of the change being reported were to be addressed or completed by the provider:  "So for the change of information, that box was checked.  ***And then it will tell you the corresponding sections of the application that needed to be updated in order to do the changes of information***."  DE:398:51 (emphasis added).  The "box" referred to by witness Wolfe is found on page 7 of the form.  *See* Govt-Exh:108:7.  Ms. Wolfe's testimony is consistent with the express content of the form, which provides that even sections of the form designated as

13

"optional" need not be updated when the form is used to report a change of information. *See* Govt-Exh:108:4 ("Any field marked as optional is not required to be completed *nor does it need to be updated* or reported as a 'change of information' as required in 42 C.F.R. section 424.516.") (emphasis added).

Wolfe was the only witness who testified about the "update" requirements of the form at issue in this case; her testimony was not contradicted by government witness Quindoza. As noted, Quindoza commented on the contents of the form at issue in Count 19, and observed that Medicare would take action if it learned false information had been provided as to ownership of a Medicare provider. He offered no testimony concerning how Medicare handles a change-of-hours form, who reviews it, the scope of such review, and the effect of an adverse decision by Medicare regarding such a form.

On cross-examination, Quindoza conceded he did not know who filled out, signed, filed or received the CMS Form 855S. DE:396:125–27. Quindoza agreed that as part of the enrollment approval process, in 2016, Medicare would send an inspector to conduct an on-site inspection of Silent Hill. DE:396:132–34. During the inspection, certain documents must be available for the inspector to review, including a copy of the insurance policy and tax EIN application, which would have been submitted to CMS in 2016 along with the actual enrollment application. *Id*. at

14

133–34. The documents contained Alexander's name. *Id*. at 140. The inspector would have seen the organizational flow chart displayed on-site showing Alexander as co-owner with Susan Alexander. *Id*. at 136. The defense showed Quindoza Silent Hill's publicly available annual reports filed with the Florida Department of State from 2015 to 2019, all of which listed Alexander along with his mother. *Id*. at 149.

FBI forensic accountant Tiffany Gorman testified about deposits and disbursements from the Silent Hill bank account to show Alexander had received Silent Hill income directly, but Susan Alexander had not directly received Silent Hill funds transfers. DE:400:244. Gorman conceded she did not examine all of Alexander's bank account information, but that he received substantial income from his orthopedic surgery practice. DE:400:227, 218–24. And the government stipulated that Gorman was not testifying that Alexander did not provide substantial financial benefits to his mother. DE:400:226 (government counsel: "We don't need to know all the different ways that Dr. Alexander took care of his mother. It's not relevant. ***It's not in dispute***.") (emphasis added).

Mindy Breitman, as noted above, conducted billing for Waxman. DE:397:76. Breitman believed Waxman was an owner of Silent Hill because he was her main point of contact, and she did not know Alexander. DE:397:80, 84–85. Emmanuel Silva testified he received payment from DME suppliers for providing doctor-

submitted prescription orders.  DE:396:208.  Silva testified he did business with Waxman's DME company Equilibrium, as well as Silent Hill and other DME companies, but he never spoke to or met with Alexander.  *Id.* at 209, 212.

Jeremy Waxman testified Alexander signed alleged "sham" contracts with marketing companies for Silent Hill.  DE:398:254.  Asked by the government whether he ever discussed with Alexander that the contracts were fake, Waxman responded, "not per se."  DE:398:252.  Regarding Count 19, Waxman testified he and Alexander agreed that neither of their names should appear on the CMS enrollment application, that Alexander's mother, Susan, should be listed instead, and that they each owned 50% of Silent Hill.  *Id.* at 174, 180–81.  On cross-examination, Waxman admitted he could not tell if a signature was in fact Alexander's, or Waxman's impersonation. DE:400:38–39.

Waxman testified that the reason Alexander did not want his name submitted on the CMS Enrollment Application was because he wanted to avoid financial liability, even though numerous documents Alexander filled out and submitted to Medicare himself (such as tax documents and insurance documents) and to the Florida Department of State identified Alexander.  DE:399:102–03.  Waxman conceded he never told Alexander "what I'm doing is illegal," DE:399:278; that documents submitted to CMS had Alexander's name on them, DE:400:18–25; and

16

that Alexander could have opened a DME on his own and kept all of the money. DE:399:274.   When Waxman and Alexander met, Waxman was a legitimate businessman and Alexander had no reason to believe Waxman was doing anything illegal. *Id*. at 266–69.  The defense also elicited evidence that Waxman had brought Alexander and Alexander's business partner into a scam business deal in which Alexander was scammed out of $600,000.  DE:400:67–71.  Waxman was the *only* witness who testified that Alexander had knowledge of any impropriety.

Regarding the form at issue in Count 19, Waxman made clear he lacked any memory of the form or even of the change of hours that appeared to prompt its filing by someone associated with Waxman.  Instead, the government's aiding-and-abetting theory rested on the premise Waxman had been aware of the form and that if he was made aware of the form, his business practice would have been to involve Alexander in the process of its filing.   However, Waxman testified that unlike other co-owners/investors he worked with in the DME business who were "very hands-on," DE:398:165, Alexander's role in the business was less regularized, with meetings about twice a month in bars or restaurants, during which Waxman would let Alexander know how the business was going. DE:398:179.  Waxman was "managing the business."  DE:398:221.  By 2019, Waxman also was not texting or emailing information to Alexander as he had done "early on when [Waxman] was showing

17

[Alexander] the paperwork, and ... I was sharing that information with him, you know, in the early stages, just to show him what was happening." *Id.* Waxman testified that communications directed to Susan Alexander at Silent Hill went to his office administrator, Magda Cedeno. DE:398:188–89. Cedeno was interviewed, but not called as a witness by the government. Although there were email records showing notice to Alexander of enrollment documents earlier when Silent Hill was starting, *see*, *e.g.*, DE:398:200, there were no email records showing or otherwise indicating Alexander received any communication regarding a change of hours at Silent Hill or the preparation or submission of a change-of-hours notice to Medicare in 2019 or at any other time.

Asked on cross-examination if the form was filed because of a change of hours by Silent Hill, Waxman responded: "I don't recall. But that sounds logical, feasible." DE:399:285. Waxman otherwise lacked any recollection about any updating of Silent Hill's hours of operation, and admitted on cross-examination that the document was not an application for enrollment as he had testified on direct examination and on which his assumptions about the document were premised. DE:399:285–87. Waxman opined that he had not signed the 2019 form. DE:398:209–10. He did not know who signed the form. DE:399:286. When asked if the form was filed by his business on behalf of Silent Hill, he stated no actual knowledge of that, but believed

18

that was the case. *Id.* Waxman testified that he did not "remember" whether he followed his "routine" and showed Lawrence the form "prior to filing or submitting" it, but noted that "[w]e typically showed every document that needed to be filed or signed by him or for the business." *Id.* Waxman did not know who prepared or filed the form and did not recall showing the form to the defendant. DE:399:285–86. Waxman admitted Alexander "[w]as not involved so much in the day-to-day operations." DE:398:164. More generally, Waxman stated his understanding with Alexander was that Waxman was responsible for "the administrative side" of the business and "did everything administrative-wise"). DE:399:292. Upon reviewing a verified exemplar of Susan Alexande's signature, Waxman agreed the signature on the form did not appear to be that of Susan Alexander. DE:399:289 (after being shown evidence of Susan Alexander's signature. Waxman states, in response to the question of how the signature on the change-of-hours form got there, "A. I do not recall. ... Q. And you can't explain how it got there? A. I don't recall.").

As to the actual enrollment applications, *unlike* the hours-change form, email traffic between Waxman and Alexander showed Waxman giving Alexander notice of the filings. *See* DE:403:11 ("And you saw the e-mails and documents demonstrating that Dr. Alexander lied to Medicare to get Silent Hill enrolled."). And when Alexander was asked by Waxman about signing for Susan Alexander,

19

Alexander did not tell Waxman to sign Susan's name but instead scribble her initials: "Q. Mr. Waxman, you just sign these documents or did you ask Dr. Alexander to help you? A. I asked for him to help [m]e. Q. And how does he respond to your request for help in signing the Medicare application documents? A. He wrote 'just scribble an s-a on there.'" DE:400:130.

Alexander called two witnesses in the defense case, both of whom addressed the conspiracy allegations of Count 6 on which the jury acquitted. The first, government cooperating witness Ronald Davidovic (who received a sentence reduction for his testimony as to other government targets), contradicted testimony by Waxman that Davidovic had discussed Silent Hill matters with, or in the presence of, Alexander. DE:401:281–85. Instead, Alexander and Davidovic had discussed only lawful business matters: how Davidovic could help Alexander's private medical practice with its website and marketing research. *Id*. at 284. Silent Hill did not come up during the meeting. Davidovic never had conversations with Alexander about purchasing what the government referred to as doctors' orders. *Id*. at 293. This directly undermined Waxman's statement that the meeting was part of a conspiracy to defraud Medicare and pay kickbacks.

Alexander also called Richard Gray, who testified as a rebuttal forensic account to address financial claims made by Tiffany Gorman. DE:402:5. Following Gray's

testimony, Alexander introduced public record exhibits (Defense Exhibits 1LA, 2LA, and 3LA) showing that, in the past, Alexander had included his mother on other business ventures even though she did not run day-to-day operations. This was important to the defense as it undermined the government's theory that Susan Alexander was nothing more than a "straw" owner, DE:402:52–54, despite her record ownership.

At the close of the government's case, Alexander moved for a judgment of acquittal. DE:347; DE:400:245. Alexander again moved for acquittal at the close of the evidence and in a post-trial motion (as to Count 19), DE:412, which was denied by the district court. DE:446. In his motions for acquittal at trial, Alexander argued, in part, that the evidence was insufficient to prove Count 19 because of the absence of materiality, including under the sole theory of materiality on which the jury was instructed, and because there was no basis for concluding that Alexander knew of or approved the making of the false statement. Alexander also argued that the government had failed to establish venue in the Southern District of Florida. DE:402:100.

## 8. Sentencing, Restitution, and Forfeiture.

On April 21, 2003, Alexander was sentenced to 33 months' imprisonment followed by three years' supervised release. DE:458. The district court postponed the

21

issue of restitution for later resolution.  With regard to forfeiture, the government filed a motion for preliminary order of forfeiture the day before sentencing, to which Alexander objected as clearly violating the timing requirement for a preliminary forfeiture order under Fed. R. Crim. P. 32.2.  *See* DE:471.  Alexander argued at sentencing that he needed additional time to respond to the government's forfeiture motion, which sought forfeiture of a specific check payment.  After Alexander reviewed the government's untimely-filed forfeiture motion, he responded, explaining that the item the government sought to forfeit never came into Alexander's possession and that the government's forfeiture claim was unfounded.  DE:467:50.

After sentencing, the government abandoned its presentencing forfeiture claim and stated in reply to Alexander's response to the forfeiture motion that it would seek a different forfeiture never raised until two months after sentencing.   DE:479.  Alexander objected that the untimely improper post-sentencing forfeiture request, made after the defendant had waived his right to presence at the renewed forfeiture hearing and after he had been transferred out of Florida, should be stricken under Rule 32.2 and was factually unfounded.  The district court proceeded with forfeiture and restitution at a hearing on June 27, 2023 and imposed a forfeiture money judgment of $125,000, while ordering restitution in the amount of $315,704.52.  DE:488:6–7.  Appellant has completed the imprisonment component of his sentence,

22

but faces post-release restrictions, including restitution and forfeiture obligations from which he appeals along with the felony conviction.

## Standards of Review

This Court reviews *de novo* whether an indictment states an offense and whether evidence is sufficient to sustain a conviction. *United States v. Grimon*, 923 F.3d 1302, 1305 (11th Cir. 2019); *United States v. Steele*, 178 F.3d 1230, 1233 (11th Cir. 1999); *United States v. Morin*, 33 F.3d 1351, 1352 (11th Cir. 1994). Generally, review of trial errors, including instructional errors, is for abuse of discretion. *United States v. Carrasco*, 381 F.3d 1237, 1242 (11th Cir. 2004) (instructional).

Sentencing decisions regarding restitution and forfeiture involve mixed questions of law and fact. *United States v. Elbeblawy*, 899 F.3d 925, 933 (11th Cir. 2018); *United States v. Bajakajian*, 524 U.S. 321, 336 (1998).

## SUMMARY OF THE ARGUMENT

1.    The district court erred in denying Alexander's motion to dismiss Count 19. The alleged false statement at issue does not fall within the purview of 18 U.S.C. § 1035's Medicare billing/services misstatements provision where it was made on a form for notifying Medicare of the hours of operation of the provider, did not affect billing for services, and did not request enrollment in Medicare.

2.    The evidence was insufficient to prove Alexander knowingly and willfully aided and abetted the inclusion of false ownership information on the 2019 form at issue in Count 19. Whoever included or later inserted that surplusage into the form did so in error and against any interest of Alexander and the DME. The inaccurate ownership information was not even optionally requested on the change of hours form. It was extraneous to use of the form to report ministerial information, and Alexander had nothing to do with its inclusion. Nor was it material to any review by Medicare of the provider's hours of operation. The record does not show Medicare was even taking the matter under consideration. Finally, the change of hours did not change the billing or scope of services. Whatever obligation there might or might not be generally to correct errors made in an enrollment application,

there was no showing that such a correction had to be made on the 2019 form or that § 1035 covers the failure to meet general obligations of correction of prior statements.

The government also failed to establish venue where no evidence was offered as to where the form was prepared, who prepared it, or who sent it, and where the government made no effort to identify even the state from where it was sent.

3.      Instructional error compels the granting of a new trial. The materiality instruction improperly permitted the jury to convict on—and in fact limited the jury to—a materiality theory that was inapplicable to the facts of the case.

4.      The district court erred at sentencing by: (A) attributing to Alexander restitution liability premised on losses that was not actually caused by Alexander's offense; and (B) imposing a forfeiture judgment that was procedurally and substantively unwarranted, where (i) the government improperly asserted a new, uncorroborated, post-sentencing forfeiture claim contrary to the requirements of Fed. R. Crim. P. 32.2 and due process, and (ii) the forfeiture was premised on speculation, exceeding the scope of charged offense.

## **ARGUMENT**

I. **THE DISTRICT COURT ERRED IN DENYING ALEXANDER'S MOTION TO DISMISS COUNT 19 FOR FAILURE TO STATE AN OFFENSE UNDER 18 U.S.C. § 1035.**

Alexander moved to dismiss Count 19 prior to trial and renewed his motion at trial when the Count 19 theory of prosecution was revised with the government's presentation of evidence showing the form at issue was *not* actually treated by Medicare as an application for enrollment, but merely as a notice of changed information that did not require—or even treat as optional—the completion of sections of the form on which the false statement allegations rested.

The district court denied the motion based on the government's explanation, and the express allegations, of the indictment that upon submission of the form, Medicare was making a decision on whether to enroll the DME provider and grant the provider billing privileges.  DE:199:7; DE:253.  With regard to the enrollment theory on which the government originally opposed the motion to dismiss, Alexander adopts the arguments by co-appellant Dean Zusmer, at pages 23–31 of his brief, designated as Issue II(a) and (b) of his brief.  As stated in the Zusmer brief, an enrollment application seeking authorization for Medicare provider status does not constitute a billing or services submission within the meaning of 18 U.S.C. § 1035.

26

In addition, dismissal is warranted even under the revised theory of prosecution as to Count 19 argued by the government at trial.  At the close of the government's case-in-chief, the government discontinued its *enrollment* theory as to Count 19 and turned to a *failure-to-update* theory regarding the form and its materiality.  Alexander argued in his motion for acquittal that the government's failure of proof on the enrollment theory vitiated the billing-and-services premise on which the dismissal motion had been denied.  DE:402:94 (defense counsel: "The theory on which [the] magistrate relied, the theory on which the Government rel[ied] in opposing a motion to dismiss was that it's material because it's an enrollment form because you're enrolling the company, and that's enabling it to bill.  The evidence has shown that it's not true."); DE:399:285 (government witness Waxman corrects direct examination testimony regarding an enrollment application and agrees that, although he does not actually know why the form was submitted, it appears to relate to a change of hours of operation).

When a CMS Form 855S is used to report informational changes for which no billing-privilege decision is being made by Medicare—and which instead amounts, at most, to a request to verify that the provider's hours of operation are within the required limits—there is no effect on billing within the meaning of § 1035.  An up-or-down decision by Medicare regarding a proposed change of hours—of which no such

27

decision was shown to have even been processed or anticipated in this case—would not have affected billing or the scope of authorized services for which billing can be submitted. If for some reason Medicare responded to the notice by saying the hours should revert to the old hours, that would not end or even affect billing privileges, nor was the business in this case still ongoing when such a decision would have been made. This notice was an after-the-fact notice to Medicare, and the use of CMS Form 855S to convey that notice did not expand Medicare's scope of action or inaction on the notice.

Similarly, other information about a provider might be provided to Medicare by letter or a telephone call, including questions about the meaning of terms and whether the provider has properly understood them. But there is no indication in the statute, the relevant precedents, or practice to believe that such non-billing matters fall within the very specific contours of § 1035, and this Court has limited its application to such matters. *See United States v. Henderson*, 893 F.3d 1338, 1347 (11th Cir. 2018) (concluding that under Section 1035(a)(2), the charged "false statement could have misled a medical professional into thinking that the services actually had been rendered"); *United States v. Melgen*, 967 F.3d 1250, 1256 (11th Cir. 2020) (§ 1035 applicable to altered documents used to falsify billing).

The absence of the requisite connection to billing for services as set forth in 18 U.S.C. § 1035 requires dismissal of Count 19.

28

## II.  THE EVIDENCE WAS INSUFFICIENT TO CONVICT ALEXANDER OF THE MATERIAL FALSE STATEMENT ALLEGATION OF COUNT 19.

The evidence was insufficient to convict Alexander of Count 19.  First, as explained above in Issue I, the statement at issue did not qualify as one made within any billing or services matter under 18 U.S.C. § 1035.  Second, the government failed to establish materiality of the statement to the administrative decision at issue.  Third, the government failed to prove Alexander's culpable involvement in the making or submission of the statement.  Finally, the government failed to establish venue.

The evidence affirmatively contradicted the materiality premise of the indictment and the jury instructions.  The alleged false statement was not a part of the form that was relevant to the matter under consideration, much less the billing nexus of § 1035, and the insertion of ownership information was not deemed even optional by Medicare, as it had nothing to do with whether the change of hours was consistent with Medicare rules or whether the company had to revert to its former hours.  Even if the form had not been filed at all, the only consequence would be that the company would have to abandon its change of hours, and its status as an authorized Medicare provider would be unaffected.

The government's reliance on vicarious liability theories was factually unsupported on key elements, including the absence of anything more than a

29

speculative nexus between Alexander and the making of the false statement by an unknown person.

The government's decision during trial—to sideline its indicted theory that ownership information is required on all CMS Form 855S filings, and replace it with the unindicted theory that whenever a provider makes a filing with Medicare, it must *update* previously-submitted inaccurate information such that the failure to update is itself a criminal violation—did not serve the purpose the government intended of filling in evidentiary gaps for Count 19. Rather than saving the prosecution, the government's amended, unindicted theory reveals the insufficiency of the indicted prosecution theory, as to both the government's attribution to Alexander of vicarious liability for the actions of whoever decided to make and submit the 2019 form and the indicted premise for materiality of the alleged false statement. If the "crime" was in the failure to report changes, then the surplusage itself was irrelevant, no different than if the section was left blank as Medicare directed. Thus, although the denial of relief in the district court was premised ultimately on the government's argument and evidence as to its new theory, this served only to highlight that Alexander was not guilty of the actual charge in Count 19. Nor did the government ever identify any statute that would have been violated by the failure to update incorrect information, nor precedent for finding that such a failure to update violates a false statement statute.

**A.**  ***Ownership information that was unnecessarily inserted into a Silent Hill change-of-hours form was not material given the context of the applicable administrative review and did not fall within the scope of 18 U.S.C. § 1035.***

The government failed to prove the essential materiality element both under the materiality theory set forth in the jury instruction on materiality[2] and under general materiality law applicable to false statement prosecutions.  Section 1 of the form at issue in Count 19 makes this clear.  *See* App. A (Gov't Ex. 108) at 7; *see also* DE:398:51(testimony of Kelly Wolfe regarding divergent requirements of the form depending on its use); DE:396:166 (government witness Quindoza admits that not all CMS 855S forms are enrollment applications).

Materiality is a mixed question of fact and law, and proving materiality beyond a reasonable doubt requires "a factual evidentiary showing." *United States v. Beer*, 518 F.2d 168, 172 (5th Cir. 1975).  Speculation does not suffice.  *See id.* ("The materiality of a statement rests upon a factual evidentiary showing, but the ultimate decision is a legal one.  If the factual showing is insufficient, a legal element of the offense is missing, and courts then direct a verdict of acquittal.").

In *United States v. Gaudin*, 515 U.S. 506 (1995), the Supreme Court explained that "[d]eciding whether a statement is 'material' requires the determination of at least

---

[2] DE:403:108 (material instruction: "To be material as to such a form, the false statement must have a natural tendency to influence or be capable of influencing the decision to *approve or deny the request to participate or enroll as a provider* of services or supplier under a federal healthcare program.").

31

two subsidiary questions of purely historical fact: (a) 'what statement was made?' and (b) '*what decision was the agency trying to make*?'" *Id.* at 509 (emphasis added); *see id.* at 512 (to prove materiality, the government must first present evidence of exactly "what decision the [agency] was trying to make").

With regard to insertion of false statements in a Medicare form, the materiality question is "whether the false answers inserted in those spaces 'ha[d] a natural tendency to influence, or [were] capable of influencing' the decision to honor or reject the claims," or in this case, the request to approve a change of hours. *United States v. White*, 27 F.3d 1531, 1535 (11th Cir. 1994) (quoting *Beer*, 518 F.2d at 171).

Medicare's instructions expressly direct that the provider include only information regarding the change being reported, along with any adverse legal actions the provider has incurred, because those are the only matters under review; the inclusion of surplusage does not affect that review. Medicare does not request or review a new completion of the ownership and management section unless the provider is reporting a change in that section of the form. Absent reporting of a change, insertion of information not requested, or even deemed optional, by Medicare is not relevant to the change being reported and is surplusage.

CMS Form 855S provides in Section 1(C) instructions as to the information Medicare requests and subjects to evaluation in any resulting decision-making. ,Only if the form is used to enroll or recertify the provider or change its tax identification

32

number, business address, ownership, or management does Medicare seek for review
any ownership or management information (sections 8 or 9 of the form).  Government
exhibit 108 (DE:435-1) provides, at page 7:

| | |
|---|---|
| ☐ You are a **new enrollee** in Medicare or are enrolling a new business location with a tax identification number not previously enrolled with the NSC MAC. | **Complete all sections** |
| ☐ You are **adding a new business location** using a tax identification number currently enrolled with the NSC MAC. | **Complete sections 1–7, 9 (for managing employee only), 11 (optional), 12, and either 14 or 15** |
| ☐ You are **reactivating** your Medicare supplier billing number. | **Complete all sections** |
| ☐ You are **revalidating** your Medicare enrollment. | **Complete all sections** |
| ☐ You are **voluntarily terminating** your Medicare enrollment.  Effective date of termination: _____ | **Complete sections 1, 2a, 4b, 4D, 11 (optional), and either 14 or 15** |
| ☒ You are **changing your Medicare enrollment information** other than your tax identification number. | **Go to Section 1D** |
| ☐ You are **changing your Tax Identification Number.** | **Complete all sections** |

Section 1(D) of the form provides that the filer is requested to provide only: the
*specified* changed information; the purpose for filing the form (Section 1); any
adverse legal actions incurred by the provider (Section 7); any documents needed to
be filed in relation to the *reported* changed information (Section 12); and a provider
filing authorization page (Section 14 or 15):

| | |
|---|---|
| ☒ Any other information not specified above | **1, 7, 11 (optional), 12 (if applicable), and either 14 or 15 and the applicable section or sub-section that is changing.** |

With regard to the change request in this case, Medicare's express directions exclude any request for restatement or reiteration of previously-reported information on any matter—including Sections 8 and 9, relating to ownership and management—even on an *optional* basis. Nothing other than the recently changed information that is being reported is to be part of that form. *See* 42 C.F.R. § 424.57(c)(2) ("The supplier must report to CMS any changes in information supplied on the application within 30 days of the change.").

The jury instructions barred Alexander's conviction unless the government could prove *the false statement* was material to the decision by Medicare "to approve or deny *the request* to participate or enroll as a provider." DE:356:27. The jury instruction did not suggest that the materiality question could relate to whether the decision on any *prior request* was affected by inaccurate information. Instead, the materiality instruction directed the jury to decide whether the false statement "had a natural tendency to influence or was capable of influencing a decision of a department or agency *in reaching a required decision*" on the matter about which the form was submitted. DE:356:27 (emphasis added). The only required decision as to the change-of-hours request was whether the change was within Medicare requirements, which in this case it was.

34

This Court's precedents preclude finding materiality of Medicare filings on a theory that Medicare rules and regulations do not support. *See United States v. Whiteside*, 285 F.3d 1345, 1351 (11th Cir. 2002) (reversing health care false statement conviction where regulations and administrative authority did not "clearly answer" the dispositive elemental question). The filing at issue was not an application for provider enrollment; hence, the jury instruction advising that the materiality element turned on whether the statement would likely affect Medicare's required decision to approve or deny such enrollment application left only one answer: the alleged false statement was not made or considered in relation to an application for enrollment that had been approved three years earlier in 2016, and its materiality could be gauged only in relation to Medicare's review of the change request itself, as to which it was *surplusage*. *See Ciminelli v. United States*, 598 U.S. 306, 316–17 (2023) ("[T]he Government asks us to cherry-pick facts presented to a jury charged on the right-to-control theory and apply them to the elements of a *different* wire fraud theory in the first instance.") (emphasis in original).

The Supreme Court has rejected the theory that materiality can be based merely on falsity even if the falsity does not relate to the decision being made. *See Maslenjak v. United States*, 582 U.S. 335, 349 (2017)(false statement does not become material simply because an applicant has lied; instead, in order for there to

35

be materiality, the "lie must have played a role" in the administrative decision to which the application is addressed). The government cannot pursue a theory of conviction that it abandoned in the trial court. Nor, in light of the jury instructions, is such an alternative theory a viable basis for affirmance in any event. *See Chiarella v. United States*, 445 U.S. 222, 236–37 (1980) ("The jury instructions demonstrate that petitioner was convicted merely because of his failure to disclose material, nonpublic information to sellers from whom he bought the stock of target corporations. The jury was not instructed on the nature or elements of a duty owed by petitioner to anyone other than the sellers. Because we cannot affirm a criminal conviction on the basis of a theory not presented to the jury, *Rewis v. United States*, 401 U.S. 808, 814 ... (1971), *see Dunn v. United States*, 442 U.S. 100, 106 ... (1979), we will not speculate upon whether such a duty exists, whether it has been breached, or whether such a breach constitutes a violation of § 10(b)."); *see United States v. Elkins*, 885 F.2d 775, 782 (11th Cir. 1989) (citing *Chiarella*, 445 U.S. at 237 n. 21). Where the jury is instructed that a guilty verdict may be returned only if specified elemental facts are found, the failure of proof of such facts therefore requires acquittal. *See United States v. Willner*, 795 F.3d 1297, 1310 (11th Cir. 2015) (conviction vacated where based on theory of guilt where "government did not prosecute [the defendant] on that theory").

36

The surplusage information on the form in this case was not material to the decision with which the Medicare contractor was presented: reviewing a permissible change in the hours of the day the Medicare provider was open. The government's counter-arguments fail to hold up to scrutiny. First, the government cannot escape the plain language it asked its witnesses to read and which government witness Wolfe identified as stating the crucial distinction between enrollment application use and change notifications. The black-and-white, Medicare-approved statement of what is material to an update of a provider's hours of operation stands unassailable on this record. The government conceded at trial that CMS Form 855S was self-explanatory, and the government's use of witness Quindoza to read aloud from the form was not to offer an expert opinion on the form's contents, much less to contradict its text. DE:396:12 (government objects to cautionary instruction on Quindoza because "Quindoza isn't opining on what the law means. He isn't trying to imply the law. *He simply read a Medicare application*.") (emphasis added). Ultimately, on cross-examination, Quindoza admitted that not all CMS Form 855S submissions are enrollment applications. DE:396:166.

Second, the government has argued that even if not part of the changes reviewed by the Medicare contractor who receives the change request, the surplusage information still could possibly have been relied on by Medicare in some way, even if by happenstance, but that strained theory was rejected in *Maslenjak*. Third, the

37

government has argued that the Court could simply put aside the question of whether the surplusage was material and rely just on the supposed (but uncharged) falsity of the certification promise made by the Medicare provider on the form, assuring Medicare of the provider's program compliance and honesty, and in that way ignore the question of whether the charged false information itself was material.

Each of the government arguments should be rejected. While a false certification—including a false claim of compliance with Medicare rules—can potentially be a prosecutable false statement offense, no such charge was levied against the defendant in this case, nor was the jury called upon to render a verdict on such an allegation or theory. Importantly, the jury acquitted the defendant of the entire laundry list of accusations about program compliance in Count 6. Instead, the defendant was charged in Count 19 only with falsely disclaiming ownership of the provider entity. That was the only alleged materially false statement in Count 19. In light of the charge-based nature of federal prosecution required by the Fifth Amendment grand jury clause and Supreme Court precedent concerning proof of an uncharged offense,[3] as well as precedent limiting the prosecution to the theories on which the jury was instructed,[4] the government's switched-theory argument fails.

---

[3] *See*, *e.g.*, *Elkins*, 885 F.2d at 782 (citing *Strone v. United States*, 361 U.S. 212, 215–17 (1960)).

[4] *See Willner*, 795 F.3d at 1310.

The Court should reject any attempt by the government to read the form in a manner inconsistent with Medicare's express instructions and with Medicare regulations on reporting changes in provider data.  Accepting the government's invitation to disregard Medicare's express requirements would render the form contradictory and the prosecution untenable.  *See Whiteside*, 285 F.3d at 1351 (reversing false statement conviction where Medicare regulations and administrative authority did not "clearly answer" the dispositive elemental question).

Nor was there evidentiary support for the random-recheck or other hypothesis for why surplusage could become a subject of a change request review.  There is only an imaginary basis to believe that an agency tasked with one assignment will go outside the scope of its task to do additional tasks (and place a provider at unwarned risk) when the regulation does not call for that.  Materiality cannot be based on pure hypothesis untethered to the actual decision making process of the agency.

Absent evidence the agency was actually called upon to make a decision, and what that decisional process was, neither the court nor a jury can determine whether the allegedly false or fraudulent statements were material.  *See United States v. Finn*, 375 F.3d 1033, 1040 (10th Cir. 2004) (citing *Kungys v. United States*, 485 U.S. 759, 770 (1988); *Gaudin*, 515 U.S. at 509)).  Where the only thing Medicare requires (and thus evaluates) is the provider's post-hoc reporting of recent changes, including

39

intervening adverse legal actions incurred by the provider, a surplusage statement about other matters is not material.

In short, Medicare was not making an enrollment decision, but was reviewing only to make sure the provider's new hours of operation were consistent with Medicare rules. To be sure, there are factually distinct circumstances in which volunteered false statements can be material to a required decision—such as the creation of false business or medical records used as backup for fraudulent billing in *United States v. Diaz*, 690 F.2d 1352, 1357–58 (11th Cir. 1982)—but such records are a natural and ordinary part of the billing and collection process, not *surplusage* that Medicare tells the provider to not even consider including optionally. *See id.* (to determine if plasma donor lists were accurate, "*it was necessary to check the donor records*," which "*provided the basis by which the FDA could determine compliance*" with statutory misbranding provisions) (emphasis added). This Court's focused analysis in *Diaz* on the interrelationship between the function of the false statement and the decision sought to be influenced was key to the determination of materiality and helps to explain why surplusage in a change notification is immaterial to review of the change. *See United States v. Bazantes*, 978 F.3d 1227, 1240 (11th Cir. 2020) (finding materiality of required payroll records; statutes and related regulations "*require* that each contractor and subcontractor working on federal construction projects make and submit weekly payroll records to the federal agency in charge of

40

the project") (emphasis added); *United States v. Demaria*, 644 F. App'x 933, 934 (11th Cir. 2016)(false statement material where defendant failed to correctly answer a *required* component of a medical certification application).

Surplusage information, however, that is not utilized by or material to the agency's decision making at issue does not satisfy the materiality element. *United States v. Corcuera-Valor*, 910 F.2d 198, 200 (5th Cir. 1990) (materiality requirement pertains to defendant's ability "to import these particular goods, not to extraneous information supplied to customs during the importing process"); *Meer v. United States*, 235 F.2d 65, 67 (10th Cir. 1956) ("Congress did not intend to make it an offense to make a false statement in a bankruptcy proceeding, where such statement involved matters extraneous to such proceeding and not material to the inquiry or issue presented."). And while the making of any immaterial false statement may be important to any agency, the falsity of the statement itself is not therefore material unless it relates to a matter pertinent to the agency's required decision. *See Diaz*, 690 F.2d at 1357.

The surplusage or extraneous information in this case was not material within the meaning of the case law or the jury instruction on materiality. The conviction should be vacated.

41

**B.**    ***Evidence of vicarious liability was lacking; Alexander did not have actual or constructive knowledge of the making of the false statement, and the government's aiding-and-abetting liability theory was speculative and unproven.***

There was no evidence that Alexander signed or submitted the form at issue in Count 19 or that he was even made aware that Silent Hill's hours of operation had undergone an immaterial change or that this necessitated an administrative notice filing. The government's evidence regarding the making and submission of the form was sketchy and speculative. The only statement the government could make with confidence about the form—although its basis for making even that statement was unclear—was that "these defendants didn't push 'submit' on the 855. We're arguing that they turned a blind eye to a lot of what was going on." DE:402:75.

The government first offered Waxman's testimony that the signature on the form was not his and looked like Alexander's mother's signature. Waxman then withdrew his opinion about who signed the form and could not identify who signed it. Waxman was testifying simply based on review of the document in court, because he could not recall ever seeing it before, ever discussing it with or showing it to Alexander (in any state of completion), ever knowing that Silent Hill had changed its hours, knowing who had handled the form or prepared it, or who submitted it. DE:398:285–86.

Waxman said that "typically" enrollment forms would be reviewed with Alexander and that if Waxman were signing Susan Alexander's name, he would check first with Alexander. DE:398:285. But Waxman did not sign the form, and the record showed that unlike every other of the few (no more than a handful) of CMS Form 855S documents filed by Silent Hill from 2016–18, this was a ministerial matter of an hours change (not an enrollment matter) with no email or other record indicating Alexander was made aware of it. Importantly, even if one could speculate that Alexander learned that the hours had changed and that Medicare was being notified, there would still be no basis to conclude that as to a document Waxman knew nothing about, Alexander would have known that false extraneous surplusage was being inserted into the form.

The totality of the evidence of Alexander's knowledge of the making of the charged false statement was zero. The typicality of a few instances years prior in which actual *enrollment applications* were addressed with Alexander by Waxman (via multiple emails as to each) said nothing about any communications with Alexander by anyone regarding the ministerial form in Count 19.

Consequently, the government's reversion to the theory that Alexander was "blind" to the administrative events at Silent Hill was the best that the government could do at trial, because his lack of hands-on involvement was undisputed.

43

But absent actual knowledge of the extraneous false surplusage on a form that Alexander did not even know was being filed, regarding an hours change Waxman could not even confirm at trial, the only vicarious liability theory left to the government was that of *Pinkerton* liability, on which the jury was instructed. However, the government is precluded from relying on that theory on appeal because Alexander was acquitted of all conspiracy allegations. And the jury instructions permitted reliance on *Pinkerton* liability only if Alexander was convicted of conspiracy. *See* DE:403:109 ("Finally, regarding Count 19, the Defendant, Alexander, *if you have first found the Defendant, Alexander, guilty of there crime of conspiracy as charged in Count 6*, you may also find the Defendant, Alexander, guilty of Count 19 if you find the Defendant did not personally participate in the crime.") (emphasis added). Where no *Pinkerton* instruction was given to the jury, a vicarious liability premise for conviction "can only be sustained under an aiding and abetting theory." *United States v. Camargo-Vergara*, 57 F.3d 993, 1001 (11th Cir. 1995); *accord United States v. Perez*, 922 F.2d 782, 785 n. 4 (11th Cir. 1991).

However, the aiding-and-abetting theory fails because government failed to prove the essential aiding-and-abetting elements for a false statement prosecution, failing even to show that Waxman himself participated in the false statement offense. *See Hendrix v. United States*, 327 F.2d 971, 975 (5th Cir. 1964) (jury must still find

44

the "offense to have been committed by a principal and that the principal was aided or abetted by the accused").

"As at common law, a person is liable under [18 U.S.C.] § 2 for aiding and abetting a crime if (and only if) he (1) takes an affirmative act in furtherance of that offense, (2) with the intent of facilitating the offense's commission." *Rosemond v. United States*, 572 U.S. 65, 71 (2014). "[T]he intent must go to the specific and entire crime charged—so here, to the full scope" of the charged crime. *Id.* at 76; *see id.* at 77 ("We have previously found that intent requirement satisfied when a person actively participates in a criminal venture with *full knowledge of the circumstances constituting the charged offense*.") (emphasis added); *id.* at 82 (remanding for consideration of error where jury instruction "failed to convey that Rosemond had to have advance knowledge, of the kind we have described, that a confederate would" commit the additional charged criminal act, beyond the core crime the two were engaged in committing); *United States v. Davis*, 754 F.3d 1205, 1222 (11th Cir.), *opinion reinstated* 785 F.3d 498, 500 (11th Cir. 2015) (en banc) (defendant must have the "requisite 'advance knowledge' described in *Rosemond*"); *accord Steiner v. United States*, 940 F.3d 1282, 1290 (11th Cir. 2019).

The advance knowledge requirement is identical to the indictment's allegation that Alexander could be found guilty only if he was responsible for signing and

submitting the document while "knowing the same to contain a materially false, fictious [sic], and fraudulent statement and entry." DE:1:31. And more to the point, the relevant willfulness jury instruction, to which the government agreed, provided that the defendant could not have the requisite mens rea for the offense unless "the act was done purposely with the specific intent to violate *a known legal duty*." DE:356:33 (emphasis added). The government simply could not nearly approach meeting the elemental burden where its sole fact witness could do nothing but speculate about a matter he had no recollection of at all.

Precedent concerning aiding and abetting the making of a false statement in a health care matter directs use of these standards to bar a conviction absent proof of knowledge that the falsification would be made on the relevant document. *See United States v. Hayes*, 574 F.3d 460, 477 (8th Cir. 2009) ("Despite the evidence of Hayes's involvement with the health care conspiracy at Complete Care and the fact that we must view the evidence in the light most favorable to the government, there was no evidence that Hayes knew Silvers was falsifying the training waiver justification form or that Hayes committed an affirmative act to further Silvers's offense. Given the utter lack of evidence on either point, no rational juror could have found beyond a reasonable doubt that Hayes aided and abetted the false statement.").

As this Court explained in reversing a false statement prosecution under 18 U.S.C. § 1001, even in a case where a defendant is found to have *signed* a

46

certification of a false document, the government must first prove the defendant "actually knew the contents" of such a false statement. *United States v. Robison*, 505 F.3d 1208, 1228, 1229 (11th Cir. 2007) (concluding "the government cannot point to any evidence that Robison actually knew the contents of the particular inspection reports accompanying the certifications or that Robison actually knew that those particular inspection reports contained false information"; absent knowledge of the contents, there can no knowing falsity; "no evidence that Robison ever personally reviewed the plant inspection reports or had personal knowledge of the contents of the plant inspection reports, which is needed to show that his certifications about the reports were false"). Waxman did not claim Dr. Alexander shared in any criminal intent as to the false statement in Count 19, because Waxman did not recall even whether he had criminal intent regarding that document or anything else about it. *United States v. Martinez*, 555 F.2d 1269, 1271 (5th Cir.1977) (aiding and abetting offense occurs when a defendant assists the perpetrator of the crime while sharing in the requisite criminal intent); *accord United States v. Newton*, 44 F.3d 913, 921 (11th Cir. 1994).

The government's guesswork theory for the felony conviction in this case should be rejected. We do not know who prepared, signed, or submitted the form. We do not know on this record if Silent Hill actually changed its hours, nor why extraneous surplusage was included. In closing argument, the government contended

47

not that Alexander knew everything Waxman did, but that he "turned a blind eye. ... Mr. Waxman, he managed the day to day of Silent Hill.  And Mr. Alexander was the money man. And [Alexander] sat back."  DE:403:8; *see* DE:403:11 ("He's in for a penny. He's in for a pound."); DE:403:80 ("Jeremy Waxman ... managed these companies. He ran the day to day. ... Jeremy Waxman was the manager."); DE:403:9 ("There will be no dispute, Jeremy Waxman managed Silent Hill.").

Despite the government's "blind eye" argument, the deliberate ignorance theory does not permit a conviction on less than the evidence required for aiding and abetting.  This Court has repeatedly found deliberate ignorance applicable "only when there is evidence in the record showing the defendant purposely contrived to avoid learning the truth."  *United States v. Esquenazi*, 752 F.3d 912, 931 (11th Cir. 2014). Deliberate ignorance is not shown where "the evidence only points to either actual knowledge or no knowledge on the part of the defendant.'"  *Id*. (quoting *United States v. Stone*, 9 F.3d 934, 937 (11th Cir. 1993)).

At trial, the Government did not introduce evidence that Alexander "had every reason to know" that an employee of Waxman had included false, surplusage information on a change-of-hours form or indeed that the business had even made or reported an utterly insignificant change of hours that Medicare did not even process. There was no evidence that he "deliberately closed his eyes" to the nonsensical and unexpected inclusion of a lie about a matter that was not at issue at the time.

48

The government failed to prove the offense charged and failed to adhere to statutory requirements. The conviction should be vacated.

**C.** ***Failure to establish venue requires vacating the conviction and remanding for a new trial.***

The government failed to establish venue in the Southern District of Florida, such as by tracing the submission of the change-of-hours form or identify who submitted it.

The government offered no evidence as to: who filled in the form, who signed it, who submitted it, who, if anyone, authorized its submission, and who knew the form was submitted; where the form was sent from; who knew any form had to be submitted to change hours of operation. The government speculated that Magda Cedeno, who was not alleged to have acted criminally, might be the person responsible for the filing at issue. The government asserted that "the office that Magda [Cedeno] worked out of was in the Southern District of Florida." DE:402:89. But there was no substantial evidence as to the specific location where Cedeno personally did any work for Waxman. Nor was a convincing case made as to whether it was Cedeno who was responsible. The government was left with guesswork as to the location of the making and submission of the form. The burden concerning venue is not as high. It is not a beyond-a-reasonable-doubt test. But its not toothless. It is a real standard by real evidence. And the evidence was lacking in this case. *See*

49

*United States v. Smith*, 22 F.4th 1236, 1243 (11th Cir.), *aff'd*, 599 U.S. 236 (2023) (reversing and remanding for new trial based on failure of proof of "essential conduct" of the offense in the venue of prosecution).

## III. THE DISTRICT COURT'S ERRONEOUS JURY INSTRUCTION ON MATERIALITY RESULTED IN ALEXANDER'S CONVICTION ON AN INAPPLICABLE THEORY AND DEPRIVED ALEXANDER OF A FAIR TRIAL.

Instructional error rendered Alexander's trial fundamentally unfair.  The materiality instruction permitted the jury to convict Alexander on a theory applicable only to the use of a CMS Form 855S as an enrollment application, a use to which the form was not employed in light of the evidence presented by the government on Count 19.  DE:356:27.  The erroneous materiality instruction invited a verdict based on an invalid theory of the case, as explained above, where there was no enrollment decision being made as to Count 19's change-of-hours form.[5]  The district court erroneously overruled the defense objection that the materiality instruction was unduly prejudicial as it was "inconsistent with the evidence." D E:402:70.

The district court's erroneous jury instructions, and denials of essential defense-requested instructions needed in the context of confusing evidence and arguments by the government on the requirements and purpose of the form deprived

---

[5]   The district court also erred in granting the government's request for a deliberate ignorance instruction. Alexander has adopted the brief of co-appellant Dean Zusmer on the issue of the deliberate-ignorance instructional error.  *See supra* at viii.

Alexander of a fair trial.  In closing, the government argued a materiality theory at odds with the jury instruction: "[H]ad [Medicare] known that this contained lies, they wouldn't have kept them enrolled, they would have reversed claims, and they would have stopped over payment."  DE:403:17.  *See* DE:403:81 ("It's not that you must disclose it up front. You have an ongoing duty to update that."); DE:403:86 (government characterized their expert's testimony as follows: "What did Steven Quindoza tell you? Every 855, no matter the reason it's filed, matters. That's why there's that certification. That's why there's pages about the penalties for lying on 855. Medicare cares.").

"The jury could have been misled or confused by this instruction in its consideration of the testimony."  *United States v. Grigsby*, 111 F.3d 806, 821 (11th Cir. 1997) (reversing based on offense misleading instruction regarding specific intent applicable to charged offense).  The government's closing argument that any lie—even about a matter unrelated to the submission of a change-of-hours form—is material because Medicare does not want to do business with liars contributed to the confusion caused by the instruction.

The instructional error, particularly in light of ill-defined government closing arguments on materiality, caused substantial prejudice to Alexander's right to a fair adversarial testing of the government's case.  A new trial should be granted.

51

**IV.    THE DISTRICT COURT ERRED IN IMPOSING FORFEITURE THE GOVERNMENT HAD NOT SOUGHT OR PROVIDED NOTICE OF AS OF SENTENCING AND WHICH RESTED ON SPECULATION AS TO UNCHARGED CRIMES UNTETHERED TO THE OFFENSE OF CONVICTION, VIOLATING FIFTH AND SIXTH RIGHTS, FORFEITURE STATUTES, AND FED. R. CRIM. P. 32.2, INCLUDING AS TO ACQUITTED CONDUCT.**

**A.    *Erroneous restitution award where causation was lacking*.**

The false statement in this case caused no loss.  The evidence failed to show that the change-of-hours form was not even processed by Medicare, much less relied on or acted on for any purpose.  There certainly was no letter of action by Medicare on the change notice.  Nor is restitution properly a penalty for committing a crime.

> We begin by recognizing that "the purpose of restitution is not to provide a windfall for crime victims but rather to ensure that victims, to the greatest extent possible, are made whole for their losses." *United States v. Martin*, 803 F.3d 581, 594 (11th Cir. 2015) (cleaned up). For that reason, "[r]estitution is not designed to punish the defendant." *Id.* at 595. To accomplish restitution's purpose, a court must base the amount of restitution awarded to the victim on the amount of loss that the defendant's conduct "*actually caused*." *United States v. Huff*, 609 F.3d 1240, 1247 (11th Cir. 2010) (citation omitted).

*United States v. Young*, 108 F.4th 1307, 1319 (11th Cir. 2024) (emphasis in *Young*); *see United States v. Liss*, 265 F.3d 1220, 1231 (11th Cir.2001) (restitution award "must be based on the amount of loss *actually caused* by the defendant's conduct") (emphasis added).

Absent loss causation, there was no basis for imposition of restitution.  The

52

district court erred in finding loss causation in the absence of evidence that the false statement itself was even observed by Medicare, much less that any action on or processing of the document occurred. DE:508:29. Instead, the government admitted that it presented no evidence of any *action* or *review* of the document (much less the false statement) by Medicare. Absent any evidence to even begin the process of determining if there was actual *reliance* on the false statement or if Medicare even looked at the surplusage, restitution was unwarranted. *See* DE:482:3 (government stipulates: "In this case, the government has not produced to date a letter of receipt or a letter of processing by the Medicare contractor for the January 2019 855S form for Silent Hill."; "The government did not offer evidence at trial as to when the referenced changed enrollment information was reviewed by the Medicare contractor."). Although the document was found in Medicare's files and was received at some point in time by Medicare, Govt-Exh:41, the question of reliance and causation remained speculative at best. Hence, there should have been no restitution order.

**B.    *Erroneous forfeiture order*.**

The district court's forfeiture determination was procedurally and substantively erroneous, unreasonably discounted Alexander's acquittal of fraud allegations, and failed the Supreme Court's offense-causation test. A forfeiture money judgment should reflect the property obtained because of the offense of conviction. *See* 21

U.S.C. § 853; *United States v. Honeycutt*, 581 U.S. 443, 451 (2017). The forfeiture order imposed after sentencing—for $125,000, premised on an estimate made by Jeremy Waxman of (possibly cash) payments made to Alexander in 2019 upon closing the DME business—was not raised until after sentencing.

At sentencing, Alexander contested the government's forfeiture motion—which was filed the day before sentencing—relating to a supposed check payment occurring at a different time in an ordinary distribution from the DME business. DE:467:50 (defense explains: "Every document that was introduced in trial said the defendant had the defendant's total receipts, and I can cite the Court the exhibit numbers that the Government introduced to the jury – all of the receipts by the defendant, every single dollar ends by 2018."). The government did not respond to that objection at sentencing, but abandoned the forfeiture claim made at sentencing in a later filing—without filing a new forfeiture motion, nor seeking leave to do so. DE:479.

The district court did not enter a forfeiture order at sentencing, nor did it include one in the original sentencing judgment. DE:458. The defense was instead given more time to further rebut the government's forfeiture motion, and it did. DE:471. In light of the failure of the forfeiture motion filed presentencing by the government, the forfeiture matter should have concluded. But the government instead

54

raised, impermissibly in a reply memorandum, a new forfeiture claim, one that lacked any documentation or definite calculation and which lacked tracing or other specific connection to the offense of conviction.  DE:479.

Given the absence of any basis for the forfeiture claim presented by the government at sentencing and the absence of a forfeiture order in the sentencing judgment, and given that the new forfeiture claim was devised by the government only after it abandoned the forfeiture claim litigated at sentencing and raised only in a post-sentencing reply memorandum, Alexander objected:

> [T]he forfeiture motion should be denied. The Government cannot – after sentencing, in reply to the defendant's response to the Pre-sentencing forfeiture motion, which was necessitated because the pre-sentencing forfeiture motion was improperly filed one day before sentencing, in violation of Rule 32.2 of the Federal Rules of Criminal Procedures – the Government cannot after sentencing come up with a new basis for asserting forfeiture as to a different set of assets than it claimed in the pre-sentencing motion, even if the pre-sentencing motion were timely.

DE:508:31–32.

The district court's decision to permit the government to withdraw the forfeiture claim it had made at sentencing, for which a continuance was granted to permit the defendant to rebut it, and to permit the government to seek to forfeit different assets at a post-sentencing hearing, prejudicially violated Alexander's rights

under *McIntosh v. United States*, 601 U.S. 330, 344 (2024) ("Noncompliance with [Fed. R. Crim. P.] 32.2(b)(2)(B)'s timing requirement is a procedural error subject to harmlessness review."); *id.* at 341 n. 5 ("[T]his case does not implicate [Fed. R. Crim. P.] 32.2(b)(4)(B)'s requirement that forfeiture be imposed at sentencing.").

The forfeiture sought post-sentencing by the government was not the same as the forfeiture heard at sentencing. *See* DE:509:31–34 (explaining the Rule 32.2 objection, the harmful effect of presenting a new forfeiture claim after sentencing litigation has shown the limits of government's original forfeiture claim, and impropriety of raising new penalty claims for the first time after sentencing).

In addition, the speculative theory on which the district court ultimately rested its forfeiture decision should be reversed, where the government failed to meet its burden under 18 U.S.C. § 982(a)(7) to seek to forfeit only "property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense." For the same reasons as with the restitution order, the government failed to prove that any property at issue related to—was caused by—the conduct of conviction—i.e., by surplusage in a document that was in effect a nullity as to Medicare. *See* DE:508:34–37, 39–41 (explaining that the government failed to prove its claim of forfeitable property arising from the commission of the offense).

The forfeiture order should be vacated.  The district court's failure to fully constrain all preliminary forfeiture issues at the time of sentencing, as required by Rule 32.2(b)(4)(B), compels reversal.  Forfeiture, if it is imposed, must be imposed at sentencing—or at least cabined so that the defendant knows at sentencing what is being sought in forfeiture.  *United States v. Lee*, 77 F.4th 565, 582 (7th Cir. 2023) ("requirement that [a final order] must be included in the oral judgment of the court has the character of a claims-processing rule"); *United States v. Farias*, 836 F.3d 1315, 1330 (11th Cir. 2016) (Rule 32.2(b)(2)(B) error—failing to resolve forfeiture order issues *before* sentencing—harmless *if* forfeiture fully and fairly resolved at sentencing under Rule 32.2(b)(4)(B)).  Alexander fully explained the prejudice to him on the record at the restitution hearing.  The defendant is prejudiced where the government can litigate seriatim post-sentencing forfeiture claims, particularly where, as in this case, even under the best view of the government's claim, there was no way to know whether the funds related to the count of conviction or were ever actually turned over to the defendant.

## CONCLUSION

Appellant requests that this Court vacate the judgment and remand for dismissal or a judgment of acquittal, or, alternatively, a new trial, or, alternatively, vacatur of the forfeiture and restitution orders.

Respectfully submitted,

 s/ Richard C. Klugh
RICHARD C. KLUGH, ESQ.
Attorney for Appellant
40 N.W. 3rd Street, PH 1
Miami, Florida 33128
Tel. (305) 536-1191
Fax: (305) 536-2170


## CERTIFICATE OF COMPLIANCE

I CERTIFY that this brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7). According to the WordPerfect program on which it is written, the numbered pages of this brief contain 12,935 words.

 s/ Richard C. Klugh
Richard C. Klugh


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this  3rd  day of September, 2024, the foregoing was filed electronically and thereby served upon counsel of record.

 s/ Richard C. Klugh
Richard C. Klugh